AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Southern District of Ohio

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  1:20-MJ-00374 |
| 352 Cherry Dr | ) | |
| Dayton, Ohio 45405 | ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1) ane 846 | Conspiracy to Possess with Intent to Distribute Controlled Substances. |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested
   under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael J. Matulewicz, TFO, DEA
*Printed name and title*

Sworn to before me and signed in my presence. **via electronic means.**

Date:  **May 22, 2020**

_____
*Judge's signature*

City and state: Cincinnati, Ohio

Hon. Stephanie K. Bowman, U.S. Magistrate Judge
*Printed name and title*

## <u>SUBJECT PREMISES A5</u>



**352 Cherry Drive, Dayton, Ohio 45045**, further described as a two-story single-family dwelling constructed of a gray vinyl with a light brown shingled roof. The address of "352" is affixed to the front door, which is gray in color. There are two large windows located on the front, lower level of the residence, one window located on the top level of the residence. The residence has a front porch covered with the roof acting as an awning. The Montgomery County (Ohio) auditor's website lists the parcel identification number for this residence as R72 07104A0065.

To include any safes or other containers found in the building, locked or unlocked, as well as any storage areas assigned to the residence, garages or outbuildings, front and rear yard area, and any commonly shared storage or access areas. To include any vehicles within the curtilage of the property.

<u>ATTACHMENT B:  THE ITEMS TO BE SEIZED</u>

The items to be seized are evidence of violations of Title 21, United States Code, Sections 846 and 841 (a)(1), specifically:

a.  Any and all controlled substances, including marijuana, oxycodone, suboxone, alprazolam, and any other controlled substances that can only be legally obtained by prescription;

b.  Cash derived from the sale of controlled substances;

c.  Indicia of ownership, occupancy, and control over the areas to be searched, this includes such items as leases, deeds, photographs, clothing, personal letters and papers, and utility bills;

d.  Money ledgers, customer lists of narcotics distribution, narcotic supplier lists, correspondence, notations, logs, receipts, journals, books, records and other documents (including computer disks) noting the price, quantity, and/or times when narcotics were obtained, transferred, sold, distributed, and/or concealed;

e.  Books, records, receipts, computer storage media, electronic information storage devices, bank statements and records, wire transfer records, money drafts, letters of credit, money order and cashier's check receipts, passbooks, bank checks, accounting of expenditures made and payments received, safe deposit box keys and records, money wrappers, rubber bands, money containers, safes, financial records, and notes showing payments, receipt, concealment, transfer, or movement of assets generated from the sale of narcotics;

f.  Cellular telephones, billing records and service records for cellular telephones, personal telephone and address books, listings, letters, cables, telegrams, telephone bills, fax messages, fax logs, telephone message records, telephone electronic storage devices, personal

notes, photographs, calendars, diaries and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking and money laundering activities;

g.  Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including traveler's checks, bonds, stock certificates, cashier's checks, money orders, and certificates of deposit; money counting machines; money wrappers, boxes, bags, briefcases, suitcases or containers used to carry currency or controlled substances;

h.  Records, documents and deeds reflecting the purchase or lease of real estate, any vehicles, or other items, obtained with the proceeds of the sales of controlled substances;

i.  Records, items and documents reflecting travel for the purpose of participating in narcotics trafficking, including rental car records, passports, airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to locations;

j.  Photographs and electronic images, such as video recordings and tape recordings which document the association with other co-conspirators;

k.  Firearms, ammunition, and magazines for firearms;

l.  Medical records and pharmacy records indicating medical conditions of the occupants, doctors that the occupants have seen and prescriptions issued to the occupants, including pills bottles and packaging associated with prescriptions.

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Michael J. Matulewicz, Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), being first duly sworn, hereby state:

## INTRODUCTION

1.      I am a Detective with the Norwood (Ohio) Police Department, currently assigned as a TFO with the DEA.  I have been assigned to the DEA since May of 2018 and I have been a police officer for over seven years.  As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and make arrests for offenses enumerated in Title 18, United States Code, Section 2516(1).  I earned a Bachelor's of Science Degree and graduated from the United States Marine Corps' Officer Candidate School as well as the Ohio Peace Officer Training Academy (OPOTA).  During the course of my law enforcement career, I have received hundreds of hours in various drug trainings, in addition to training in the use, preparation, and execution of search and seizure warrants through OPOTA.  As a DEA TFO, my duties and responsibilities include conducting criminal investigations for violations of federal law, particularly those found in Title 21 and Title 18 of the United States Code.  During my tenure with the DEA, I have participated in several criminal investigations seeking evidence of violations of the Controlled Substances Act (Title 21, of the United States Code).

2.      The facts set forth in this affidavit are based on personal knowledge derived from my participation in this investigation and upon information presented to me by other law enforcement officers involved in this case.  I have not included all information gained through the course of this investigation and have limited this affidavit to matters relevant to the request for search and seizure warrants.  The sources of my information and beliefs include:

1

a.  Oral and written reports about this and other investigations which I have received from DEA agents and other law enforcement authorities;

b.  Physical and electronic surveillance conducted by Special Agents of the DEA and/or other law enforcement authorities which have been reported to me either directly or indirectly;

c.  Reports from confidential informants received during the course of the investigation;

3.      I have been involved in numerous investigations into conspiracies engaged in the distribution of controlled substances and have substantially more experience in such investigations than most law enforcement officers.  By virtue of my involvement in these investigations, I have become familiar with the various means and mechanisms used by drug traffickers to import and distribute controlled substances and they ways in which they attempt to conduct their illicit business free from law enforcement detection.  I am familiar with the fact that drug traffickers make significant profits through drug trafficking, and require large amounts of currency to operate surreptitiously.  In this regard, I have obtained and executed search warrants pursuant to which I have seized ledgers, notebooks, papers, and other related record-keeping instruments, all of which have been used to record drug and related money laundering transactions, telephone books, diaries, invoices, beepers, cellular telephones and correspondence, all of which have contained evidence of drug trafficking and money laundering.

4.      During the course of my law enforcement career, I have conducted and participated in the investigation of numerous criminal offenses, including those involved in the current investigation.  I have participated in numerous drug trafficking investigations, ranging from street level dealers to major drug suppliers.  These investigations have also included the unlawful importation, possession with intent to distribute and distribution of controlled substances, the related money laundering instruments, the conducting of monetary transactions involving the

2

proceeds of specified unlawful activities, and conspiracies associated with drug offenses. These investigations during my career have resulted in the seizure of drugs and large amounts of U.S. currency, arrests of suspects, their prosecution, and ultimately conviction. These investigations have also involved the use of confidential informants, undercover agents, physical surveillance, and the execution of search warrants. I have participated in the execution of numerous search warrants authorizing the search of drug traffickers, locations associated with drug traffickers and their co-conspirators, such as residences, businesses, storage facilities, outbuildings, safety deposit boxes, and vehicles, and have written reports and analyzed documents in the course of investigations.

5.      I have been involved in numerous post-arrest interviews of drug traffickers, confidential informants, and other individuals with knowledge of drug trafficking. During such interviews and discussions with other experienced agents, I have become familiar with the day-to-day operations of distributors and transporters of controlled substances. I have gained knowledge regarding the various methods, techniques, codes, and/or jargon used by drug traffickers in the course of their criminal activities, including the use of firearms to protect their drug related activities and of cellular telephones, computer equipment, and personal digital assistants to facilitate communications while attempting to avoid law enforcement scrutiny.

6.      As a result of my participation in these, and other activities, I have gained particular knowledge in the use of undercover agents, confidential informants, physical surveillance, consensual recordings, investigative interviews, mail covers, garbage searches, GPS tracking devices, pole-mounted cameras, grand jury subpoenas, federal and state search warrants, and the application and use of wire and electronic interceptions. In addition to using these investigative techniques, I have been required to analyze information resulting from traditional record sources, such as pen register and trap and trace devices, financial records, utility records, and telephone toll

3

and subscriber records, as well as nontraditional record sources, such as the informal ledgers routinely maintained by drug traffickers listing amounts of drugs received from sources and distributed to customers and the amounts of money received from customers and owed to sources, commonly referred to as pay-owe sheets. I have also gained experience in the identification and collection of drug and non-drug evidence.

7. By virtue of my training and experience, through my conversations with and review of reports from other experienced agents and officers who conduct drug investigations, I have become familiar with the methods used by drug traffickers to import, transport, store, safeguard, remit and/or launder drug proceeds; and the methods used by drug traffickers to collect, transport, store, safeguard, remit and/or launder drug proceeds; and the methods used by drug traffickers to obtain and use telephones, computers, and other devices in order to communicate with each other. As a result of my experience, I have become familiar with the day-to-day operations and the various tools, methods, trends, paraphernalia and related articles used by various traffickers in their efforts to manufacture, possess, import, conceal, package, use and distribute controlled substances.

## PURPOSE OF THE AFFIDAVIT

8. This affidavit is submitted in support of an application for search warrants for evidence, contraband, fruits, and instrumentalities of crime, persons to be arrested, property used or intended to be used in the commission of crime(s), related to evidence of a conspiracy to possess with intent to distribute, and distribute heroin, cocaine, methamphetamine, fentanyl and/or other controlled substances.

9. For all the reasons outlined in this affidavit, I have probable cause to believe that evidence related to these crimes will be located within the following locations, which are more fully described in **Attachments A1** through **A5** (attached hereto and incorporated herein by reference):

a. 4301 Kessler Avenue, Cincinnati, Ohio 45217 (hereinafter **SUBJECT PREMISES A1**). Kenneth GREEN uses this residence to load, unload and store drugs. According to the Hamilton County Auditor's website, 4301 Kessler Avenue, Cincinnati, Ohio 45217 is owned by Matthew and Joyce Brown and was purchased on June 9, 2006. This property is further described in Attachment A1.

b. 3976 Wess Park Drive, 1st Floor, Cincinnati, Ohio 45217 (hereinafter **SUBJECT PREMISES A2**). Kenneth GREEN uses this residence to store contraband. According to the Hamilton County Auditor's website, 3976 Wess Park Drive, Cincinnati, Ohio 45217 is owned by "KGRN Investments, LLC," a limited liability corporation Kenneth GREEN created. This property is further described in Attachment A2.

c. 1134 Lois Drive, Apartment C, Cincinnati, Ohio 45237 (hereinafter **SUBJECT PREMISES A3**). This is Kenneth GREEN's residence and is suspected to be used to store contraband. This property is further described in Attachment A3.

d. 2519 Hemlock Avenue, Second Floor, Cincinnati, Ohio 45206 (hereinafter **SUBJECT PREMISES A4**). This property is Richard SOMMERVILLE's residence and suspected to be used to store contraband. According to the Hamilton County Auditor's website, 2519 Hemlock Avenue, Cincinnati, Ohio 45206 is owned Raymond JOHNSON. This property is further described in Attachment A4.

e. 352 Cherry Drive, Dayton, Ohio 45405 (hereinafter **SUBJECT PREMISES A5**). A residence that agents believe Kenneth GREEN uses to store contraband. According to the Montgomery County Auditor's website, 352 Cherry Drive, Dayton, Ohio 45405 is owned by Kenneth GREEN. This property is further described in Attachment A6 (collectively the "**SUBJECT PREMISES**").

## INVESTIGATIVE BACKGROUND AND PROBABLE CAUSE

11.     The following statement of facts and circumstances detail the involvement of certain individuals in drug trafficking and the use of the **SUBJECT PREMISES** to facilitate those drug trafficking activities.  Based on personal knowledge I gained from participation in this investigation as well as information I believe to be reliable based on oral and written reports about this investigation and other investigations, physical surveillance conducted by federal and/state law enforcement agencies, telephone toll records and subscriber information, location data obtained from GPS tracking devices, public records, and law enforcement databases, I know the following:

### A. Investigation Overview: TAPIA-LLAMAS and OJEDA-AVILA Arizona Sources of Cocaine Supply to Cincinnati

12.     Beginning on or about June 5, 2019, the DEA field office in Phoenix, Arizona began investigating a cocaine source of supply (SOS) who was supplying drugs throughout the country, including to locations in St. Louis, Missouri and Cincinnati, Ohio.  Through collaboration between DEA's offices in Phoenix, St. Louis, and Cincinnati, law enforcement learned that the Arizona SOS sourced various individuals in Cincinnati, including Kenneth GREEN and Richard SOMMERVILLE, for further drug distribution throughout the city. Ultimately, law enforcement was able to identify that SOS as Georgina TAPIA-LLAMAS.

13.     In September 2019, DEA Cincinnati also initiated an investigation into Gilberto OJEDA-AVILA.  OJEDA-AVILA was identified by agents as an individual in the Cincinnati area with bulk amounts of cash thought to be proceeds of illicit drug trafficking that OJEDA-AVILA wanted moved from Cincinnati, Ohio to other members of his DTO in Mexico.

14.     Between July 2019 and April 2020, through GPS location data, vehicle tracking data, pen register data and physical surveillance, agents were able to determine that both OJEDA-AVILA and/or TAPIA-LLAMAS traveled an established drug route from Arizona to

Cincinnati on at least six separate occasions (*i.e.* July 2019, September 2019, November 2019, December 2019, January 2020 and April 2020) to deliver drugs to local drug distributers including Gabriel THOMAS, Kenneth GREEN and Richard SOMMERVILLE.

15.     Specifically, on December 11, 2019, Ohio State Patrol traffic stopped OJEDA-AVILA in Cincinnati at which time law enforcement seized $100,146.00 U.S. Currency located inside a cardboard box in the trunk of the vehicle, which DEA TFO Charles Vanover had seen OJEDA-AVILA put in his trunk earlier that morning.  Yet, during a roadside interview, OJEDA-AVILA said he knew nothing about the bulk cash located in the trunk of the vehicle, that he moved to the Cincinnati for a landscaping job, and that he was limited in his ability to speak English.  OJEDA-AVILA was released on his own recognizance at that time.  Notably, since law enforcement first surveilled OJEDA-AVILA in September 2019, agents have never seen him landscaping.

16.     On February 7, 2020, I learned from agents in the DEA Phoenix office that agents arrived at a suspected stash house in Phoenix, Arizona, to talk with its occupants.  The occupant present upon arrival gave the agents verbal and written consent to search the residence.  Upon so doing, agents seized approximately eighteen (18) kilograms of cocaine and approximately $200,000 in U.S. currency.  When asked, the occupant identified TAPIA-LLAMAS through a driver's license photograph and OJEDA-AVILA through his passport photograph and told agents s/he had recently (within the month) sold TAPIA-LLAMAS and OJEDA-AVILA  approximately two (2) kilograms of cocaine.  The occupant was further shown a photograph of a maroon Chevrolet Silverado, which s/he said TAPIA-LLAMAS and OJEDA-AVILA were driving at the time of the drug sale.[1]

---

[1] The occupant has not been charged.  S/he continues to maintain contact with agents and provide information.  Agents have independently corroborated information s/he has provided and have deemed the source credible based on information provided thus far.  The source does have a prior conviction for drug trafficking and served prison time as a result of that conviction.

17.     On September 30, 2019, agents from DEA Cincinnati surveilled OJEDA-AVILA in Cincinnati.  OJEDA-AVILA was seen operating a maroon, 2006 Chevrolet Silverado, bearing Ohio license plate HTP6610.[2]  Then again, on December 2, 2019, agents saw this same maroon Silverado at a garage located in Fairfield, Ohio called "Audiowerks."  Agents were previously familiar with this garage because in the course of an unrelated investigation originating out of DEA Cincinnati in 2015, a confidential source (CS-1)[3] reported to agents that s/he had a hidden compartment, commonly known as a "trap," installed in a vehicle at Audiowerks.

18.     On that date in December 2019, agents saw a seat—believed to be the driver's side seat—removed from the vehicle and resting on the ground next to the Silverado.  Based on this observation and agents' prior knowledge about Audiowerks, I believe that a trap was installed in the maroon Silverado that OJEDA-AVILA frequently operated throughout 2019 and 2020.  I know, based on my training and experience, that drug traffickers install traps in their vehicles to inconspicuously transport drugs and drug proceeds.

19.     On December 20, 2019, OJEDA-AVILA was seen at the Spring Hill Suites in Cincinnati removing a roll of green cellophane/plastic wrap and flattened Home Depot cardboard boxes from the trunk of a Nissan Altima and walking into the hotel with the items.  Based on my training and experience, I know that cellophane/plastic wrap is commonly used by drug traffickers to wrap bulk currency as well as drugs.  Thereafter, agents saw OJEDA-AVILA exit the Spring Hill Suites carrying a white bag, approximately the size of a pillow case, and approach the maroon Silverado.  OJEDA-AVILA was then seen opening the driver's side door,

---

[2] 2006 Chevrolet Silverado, maroon in color, bearing Ohio registration HTP6610 with vehicle identification number 1GCEK14T36Z109163; registered to Monica D. Blunt, 700 Maple Drive, Apt. 2, Cincinnati, Ohio 45215.

[3] CS-1 is an active confidential source working for a monetary payment out of DEA Cincinnati and is not working toward a reduction in sentence for any outstanding violations.  CS-1 does not have a criminal history that includes a conviction for felony drug violations.  CS-1's only criminal conviction is an obstruction charge out of the State of Ohio in 2015.  I believe CS-1 to be a reliable and credible informant because CS-1 has provided truthful information in multiple drug investigations which led to the seizure of large amounts of controlled substances, bulk currency and the arrest of drug-traffickers.

pulling the driver's seat forward, and getting on his knees to manipulate something inside the Silverado in the area of the floorboard behind the driver's seat. OJEDA-AVILA then placed the white bag in the approximate area of the floorboard behind the driver's seat. Based on my training and experience, I believe ODEJA-AVILA placed the white bag in a "trap"—an aftermarket void installed in the vehicle—to conceal contraband items, namely, illicit drugs or bulk currency from the sale of illicit drugs.

20.     A few minutes after OJEDA-AVILA exited the hotel on December 20, 2019, agents saw TAPIA-LLAMAS, Selma Rafaela VALENZUALA-GARIBALDI, Savanna Skye PENA and an unidentified Hispanic female (UF-1) exit the Spring Hill Suites. VALENZUALA-GARIBALDI, PENA, and UF-1 entered the silver Nissan Altima, while TAPIA-LLAMAS walked to the maroon Silverado and spoke with OJEDA-AVILA. TAPIA-LLAMAS walked to the passenger side of the maroon Silverado and pulled the passenger side seat forward. She was seen leaning inside and pointing at something in the approximate area of the floorboard where OJEDA-AVILA was seen securing the white bag in the floorboard. OJEDA-AVILA and TAPIA-LLAMAS continued to talk and then TAPIA-LLAMAS handed OJEDA-AVILA a piece of paper.

21.     Thereafter, OJEDA-AVILA poured an unknown clear liquid onto a towel retrieved from the passenger side of the maroon Silverado and wiped down the areas of the maroon Silverado where OJEDA-AVILA had touched the vehicle. Based on the training and experience, I know that wiping down a vehicle the way OJEDA-AVILA did on December 20, 2019 is consistent with a drug trafficker's attempt to destroy or conceal fingerprints.

22.     Agents obtained a warrant and installed a tracker on the maroon Silverado that same day. During installation, agents saw black and red overspray under the driver's side of the vehicle as well as spray-on bed liner on an aftermarket electrical wire that ran from the trap area

to the engine compartment. Based on my training and experience, I know that overspray is excess paint that spreads or blows beyond an area of the vehicle being painted, which commonly occurs on vehicles with aftermarket installations. And, further, that spray-on bed is commonly used on vehicles that contain traps, or hidden compartments, to protect the contents (*i.e.* usually contraband drugs and/or bulk currency) from overheating.

23. While installing the tracker, agents looked inside the vehicle and did not see the white bag. I know the maroon Silverado is a single-cab pickup truck. The space between the driver and passenger seat—while in its up-right position—is not big enough to store the white bag OJEDA-AVILA placed inside it. Based on my training and experience and agents' observations of OJEDA-AVILA's manipulation of the floorboard before placing the white bag inside, I believe the maroon Silverado contained a trap used to conceal contraband that was contained in the white bag.

24. On December 21, 2019, agents remotely monitored the maroon Silverado using location data from the GPS tracking device. This information showed the maroon Silverado drove straight through the night, appearing only to stop for short durations likely to re-fuel,[4] before arriving at 6211 South Avondale Blvd., Tolleson, Arizona 85353 at approximately 3:50 a.m. on December 23, 2019. A law enforcement query of this address returned it as the listed address for TAPIA-LLAMAS. DEA Phoenix agents have identified this address as one likely used for drug trafficking activities.

25. Based on this surveillance, the information agents learned from CS-1, and knowing that OJEDA-AVILA and TAPIA-LLAMAS traffic cocaine from intercepted conversations over OJEDA-AVILA'S cell phone (Target Telephone 2) and TAPIA-LLAMAS'

---

[4] A Google search revealed that it is approximately 1,823 miles from 12001 Chase Plaza in Cincinnati, Ohio to 6211 South Avondale Boulevard in Tolleson, Arizona, which would take approximately twenty-six (26) hours to drive.

cell phone (Target Telephone 3) discussed below, and my knowledge that drugs usually travel north, while currency usually travels south, and the fact that bulk cash was seized from OJEDA-AVILA on December 12, 2019, I believe the white bag contained bulk cash hidden in the trap of the maroon Silverado and was payment for TAPIA-LLAMAS sourcing cocaine to OJEDA-AVILA for further distribution in the Cincinnati area.

26.     Most recently, agents were able to determine from wire and electronic intercepts over Target Telephone 2 and Target Telephone 3 that OJEDA-AVILA and TAPIA-LLMAS are coordinating to deliver between ten and twelve kilograms of cocaine to local distributors—specifically GREEN and SOMMERVILLE—in the very near future.

### B. Interceptions over TAPIA-LLAMAS' and OJEDA-AVILA's Phones Show the Two Currently Traffic Cocaine from Arizona to Cincinnati

27.     On April 24, 2020, Matthew W. McFarland, United States District Court Judge for the Southern District of Ohio authorized the initial interception of wire and electronic communications over (602) 461-3929 (Target Telephone 2) subscribed to "Luisa Hernandez" and used by Gilberto OJEDA-AVILA.  Interception over Target Telephone 2 is authorized through May 23, 2020.

28.     On May 1, 2020, Matthew W. McFarland, United States District Court Judge for the Southern District of Ohio authorized the initial interception of wire and electronic communications over (623) 233-9073 (Target Telephone 3) subscribed to "Luisa Hernandez" and used by Georgina TAPIA-LLAMAS.  Interception over Target Telephone 3 is authorized through May 30, 2020.

29.     On May 6, 2020, Matthew W. McFarland, United States District Court Judge for the Southern District of Ohio authorized the initial interception of wire and electronic communications over (602) 825-6800 (Target Telephone 4) subscribed to "Luis Morales" and used

by Gilberto OJEDA-AVILA. Interception over Target Telephone 4 is authorized through June 5, 2020.

30. On April 25, 2020 at approximately 11:54 a.m., agents intercepted a phone call over Target Telephone 2, used by OJEDA-AVILA, to Target Telephone 3, used by TAPIA-LLMAS. The following is transcript of that conversation:[5]

| TAPIA-LLMAS | Hello. |
|---|---|
| OJEDA-AVILA | Good morning, good morning. |
| TAPIA-LLMAS | Good morning. |
| OJEDA-AVILA | How are you? Resting? |
| TAPIA-LLMAS | Hmm, yes. |
| OJEDA-AVILA | Hey, I'm sorry. Um, I am calling you to tell you that I am about to get on my way over there |
| TAPIA-LLMAS | Oh, well. Right now? |
| OJEDA-AVILA | Eh… |
| TAPIA-LLMAS | I am waking up here now. |
| OJEDA-AVILA | Yes, that's good. A big hug, okay? |
| TAPIA-LLMAS | Grab some lemons |
| OJEDA-AVILA | Oh, okay. I am gonna grab that then at Walmart |
| TAPIA-LLMAS | Well, even if it's just one or three, my son. |
| OJEDA-AVILA | Oh, okay. |
| TAPIA-LLMAS | Okay? |
| OJEDA-AVILA | Alright, thank you |
| TAPIA-LLMAS | Mm-hmm, bye |
| OJEDA-AVILA | Bye. |

31. Based on my training and experience and my knowledge that OJEDA-AVILA and TAPIA-LLMAS are involved in drug trafficking, I believe that when TAPIA-LLMAS used the word "lemons" she was using it as a code word to refer to a kilogram of cocaine, as further discussed below.

---

[5] The conversation took place in Spanish, but were translated by certified translators working with the DEA into English.

32.     On April 25, 2020, at approximately 12:21 p.m., agents intercepted a call over Target Telephone 2, used by OJEDA-AVILA from Target Telephone 3, used by TAPIA-LLAMAS.  The following is a transcript of that conversation:[6]

| | |
|---|---|
| OJEDA-AVILA | Hello? |
| TAPIA-LLAMAS | Good morning! |
| OJEDA-AVILA | Good morning! |
| TAPIA-LLAMAS | Mm-hmm. [CLEARS THROAT] How are you doing? |
| OJEDA-AVILA | I am good, thanks to God. And you? |
| TAPIA-LLAMAS | Good, also thanks to God. |
| OJEDA-AVILA | Alright, that's good. |
| TAPIA-LLAMAS | [CLEARS THROAT] |
| OJEDA-AVILA | Um, I started to grab the little lemons. |
| TAPIA-LLAMAS | Did you get rid of the ones you have with you and grabbed the new ones, my son? |
| OJEDA-AVILA | Um, yes. |
| TAPIA-LLAMAS | Oh, that's good. |
| OJEDA-AVILA | I am bringing you the new ones. |
| TAPIA-LLAMAS | Good. [CLEARS THROAT] Well, come with that carefully. Um, I think we are going to arrive at about the same time. |
| OJEDA-AVILA | Oh, okay. Very good. |
| TAPIA-LLAMAS | Well, I was thinking that you should call Pancho in a bit. |
| OJEDA-AVILA | Uh-huh. |
| TAPIA-LLAMAS | So you can pick him up so that you guys take this car already to deliver. |
| OJEDA-AVILA | Oh, okay. |
| TAPIA-LLAMAS | Well, and then we'll see each other at the office. |
| OJEDA-AVILA | Alright, that's good. |
| TAPIA-LLAMAS | Good, call me. |
| OJEDA-AVILA | Yes. |
| TAPIA-LLAMAS | About when you are coming, one hour before you arrive. |
| OJEDA-AVILA | Yes, uh-huh. |
| TAPIA-LLAMAS | To see how we are doing. |
| OJEDA-AVILA | Uh-huh, yes. Anyway, I am going to get rid of this one. I am going to take over here, by the forty (40). |
| TAPIA-LLAMAS | Oh, well. |
| OJEDA-AVILA | Uh-huh. I'm leaving straight from here already. |
| TAPIA-LLAMAS | That's good. Alright then. |
| OJEDA-AVILA | Okay. That's good. |
| TAPIA-LLAMAS | God bless you, my son. Be very careful. |
| OJEDA-AVILA | Thank you. Yes, thank you. |
| TAPIA-LLAMAS | And, over there, by the forty (40), be careful with your speed more |

---

[6] The conversation took place in Spanish, but were translated by certified translators working with the DEA into English.

|  | than over there. Be very careful. |
| --- | --- |
| OJEDA-AVILA | Oh, okay. |
| TAPIA-LLAMAS | Okay? |
| OJEDA-AVILA | Alright then. |
| TAPIA-LLAMAS | Alright, later. |
| OJEDA-AVILA | Bye. |

33.     Based on my training and experience, my knowledge that TAPIA-LLAMAS and OJEDA-AVILA are involved in drug trafficking, my knowledge that it is unusual for someone to put so much emphasis on one to three "lemons," TAPIA-LLAMAS' request that OJEDA-AVILA—who was driving with the "lemons"—do so "very careful[ly]" and watch his speed, and my knowledge that at the time of the conversation with TAPIA-LLMAS location data obtained from OJEDA-AVILA's phone showed him traveling east on Interstate 40, I believe that "lemons" is a code word for a kilogram of cocaine.

34.     On April 27, 2020, agents intercepted multiple calls from Target Telephone 2, a phone used by OJEDA-AVILA, to Mexico telephone number 52-16677479417.  Agents were able to determine that OJEDA-AVILA was coordinating with the unidentified male (UM-1) using the Mexico telephone number to pick up multiple kilograms of drugs, which agents believe is cocaine, in the Long Beach, California area.  At approximately 9:55 p.m., agents intercepted a call between Target Telephone 2 and UM-1.  OJEDA-AVILA discussed the pick-up of ten (10) kilograms of suspected cocaine, however, UM-1 was not able to fulfill OJEDA-AVILA's request within OJEDA-AVILA's requested timeframe.  Eventually, UM-1 advised OJEDA-AVILA that he would make it right and that he could fulfill OJEDA-AVILA's request by the next day.  Agents reviewed pen register data and confirmed an outgoing text message from Target Telephone 2 to Kenneth GREEN's telephone immediately after Target Telephone 2 ended the phone call with UM-1.

35. Further conversations intercepted between Target Telephone 2 and Mexico phone number 52-16677479417 determined that UM-1 would eventually fulfill OJEDA-AVILA's request and agreed to provide OJEDA-AVILA with ten (10) kilograms of suspected cocaine. OJEDA-AVILA and UM-1 discussed the logistics of distribution and agreed that eight (8) days would be sufficient to provide UM-1 with the money for the drugs. Agents reviewed pen register data and confirmed there were multiple text messages exchanged with Target Telephone 2 and GREEN's phone around the time of the intercepted calls between OJEDA-AVILA and UM-1.

36. On April 28, 2020, agents intercepted a series of text messages between Target Telephone 2 and a telephone used by SOMMERVILLE:

| OJEDA-AVILA | Hi friend, I'm Mexico. to warn that there is a delay with the departure but everything is fine |
| --- | --- |
| SOMMERVILLE | Ok. See you soon. Thank you |
| OJEDA-AVILA | Thanks to you friend a big hug blessings |

Based on the calls between Target Telephone 2 and UM-1 using Mexico phone number 52-16677479417, WhatsApp text messages exchanged between Target Telephone 2 and Kenneth GREEN's phone in conjunction with communications between UM-1 over the Mexico number 52-16677479417 and OJEDA-AVILA in close succession to text messages exchanged between Target Telephone 2 and a telephone used by SOMMERVILLE (believed to be a Cincinnati drug trafficker) agents were able to verify that the ten (10) kilograms of suspected cocaine were to be delivered to GREEN and SOMMERVILLE.

37. Specifically, in the text message between Target Telephone 2 and SOMMERVILLE, I believe that OJEDA-AVILA told SOMMERVILLE that the drug shipment was delayed, which is corroborated by a previous conversation OJEDA-AVILA had with the unidentified male from Los Angeles on April 26, 2020. OJEDA-AVILA first attempted to fulfill his drug order through his Los Angeles source of supply who was ultimately unable to deliver,

which is when he then reached out to UM-1 on April 27, 2020 to supply the cocaine for GREEN and SOMMERVILLE. The intercepted text message on April 28, 2020 above is OJEDA-AVILA making SOMMERVILLE aware of the delay.

38. On May 11, 2020, agents intercepted a call on Target Telephone 4 and Mexico number 52-16381122969, believed to be used by TAPIA-LLAMAS. Agents determined that TAPIA-LLAMAS was in Mexico, coordinating with OJEDA-AVILA to meet with his "uncle." On May 14, 2020, OJEDA-AVILA called his "uncle" (hereinafter UM-2) on Mexico number 52-16671835146 and the two discussed the logistics of crossing the border and specifically discussed the need for an American to drive the car. OJEDA-AVILA also and told UM-2 that his "people" would be arriving at UM-2's location later that day. That same day, agents intercepted a call on Target Telephone 4 where TAPIA-LLAMAS told OJEDA-AVILA that she was approximately two (2) hours away. OJEDA-AVILA told TAPIA-LLAMAS that he would tell the "old man" before ending the call with TAPIA-LLAMAS. Immediately after, OJEDA-AVILA called UM-2, addressed him as "old man," and told him that his "friends" would be there in approximately two (2) hours. Agents were able to determine that TAPIA-LLAMAS eventually met with UM-2 at an unknown location in Mexico. Based on my training and experience, I believe the meeting coordinated by OJEDA-AVILA between TAPIA-LLAMAS and UM-2 was in furtherance of drug trafficking.

39. On May 21, 2020, agents determined that OJEDA-AVILA and VALENZUELA-GARIBALDI were in the Los Angeles, California area together based on location data obtained from their respective phones. Later that day, agents intercepted a call on Target Telephone 4 and UM-2. During the intercepted call, OJEDA-AVILA advised UM-2 that the "chavos" are on the move. Shortly after the intercepted call, agents began receiving location data from telephone number 602-649-8307, a number used by TAPIA-LLAMAS. Agents determined that TAPIA-

16

LLAMAS and VALENZUELA-GARIBALDI were moving east, in tandem, last seen east of the New Mexico and Texas border.

40.     Based on my training and experience, my knowledge of TAPIA-LLAMAS' and UM-2's meeting in Mexico on May 11, 2020, my knowledge that OJEDA-AVILA and TAPIA-LLAMAS have picked up drugs in Los Angeles before, and OJEDA-AVILA's and VALENZUELA-GARIBALDI's May 21, 2020 trip to Los Angeles, and my knowledge of TAPIA-LLAMAS and OJEDA-AVILA's involvement in drug trafficking, I believe that when OJEDA-AVILA told UM-2 that the "chavos" are on the move, that he was referring to drugs.  Further, I know that TAPIA-LLAMAS and VALENZUELA-GARIBALDI travel an established drug route east when delivering drugs to Cincinnati, Ohio. Based on the information mentioned above, I believe that TAPIA-LLAMAS and VALENZUELA-GARIBALDI are transporting drugs from the Los Angeles, California area and that those drugs are going to be delivered to GREEN and SOMMERVILLE in Cincinnati, Ohio.

### C.  Probable Cause for SUBJECT PREMISES A1, A2, A3 and A5

41.     On December 23, 2019, the Honorable Karen L. Litkovitz, United States Magistrate Judge in the Southern District of Ohio, signed a search warrant under case number 1:19-MJ-882 authorizing the installation and monitoring of a GPS tracking device on GREEN's BMW for a period of forty-five (45) days.  On December 30, 2019 at approximately 4:40 a.m., DEA Cincinnati agents successfully installed a GPS tracker on GREEN's BMW while it was parked in front of **SUBJECT PREMISES A3**.

42.     On December 4, 2019, GPS tracking information from OJEDA-AVILA's Mercedes Benz, agents established surveillance in the area of Verizon Wireless located at 5425 Dixie Highway, Fairfield, Ohio 45014.  On this date, OJEDA-AVILA was seen visiting several Verizon Wireless stores before traveling to 11559 Gallahad Court, Cincinnati, Ohio 45240.  Based

on my training and experience, I know that drug traffickers frequent cellphone stores to purchase replacement telephones in order to evade and deter law enforcement.

43.    At approximately 3:50 p.m. that same day, agents saw OJEDA-AVILA park the Mercedes Benz in the driveway to 11559 Gallahad Court location behind GREEN's unoccupied black BMW. Immediately after parking, OJEDA-AVILA was seen exiting the Mercedes Benz carrying a cumbersome item into the residence.

44.    At approximately 5:25 p.m., agents saw OJEDA-AVILA and GREEN exit the residence together. GREEN was carrying a black bag and OJEDA-AVILA was empty-handed. GREEN placed the black bag in the backseat of his BMW. GREEN and OJEDA-AVILA entered their respective vehicles and left the residence simultaneously.

45.    Agents maintained surveillance on GREEN who drove directly to his residence located at 1134 Lois Lane, Cincinnati, Ohio 45237 (**SUBJECT PREMISES A3**). GPS location data from the tracking device installed on OJEDA-AVILA's Mercedes Benz showed that he traveled directly to 17 Criswell Lane, Fairfield, Ohio. Based on my training and experience, I believe that the meet between OJEDA-AVILA and GREEN was indicative of drug trafficking, and specifically, that OJEDA-AVILA transferred illegal drugs to GREEN and that GREEN used **SUBJECT PREMISES A3** to store those drugs. Throughout the course of the investigation, agents have been able to verify that GREEN continues stay in **SUBJECT PREMISES A3** during the overnight hours.

46.    On December 10, 2019 at approximately 6:53 p.m., agents saw OJEDA-AVILA and TAPIA-LLAMAS meet with GREEN at the Dick's Sporting Goods located at 7800 Montgomery Road in Cincinnati. OJEDA-AVILA parked the Mercedes Benz next to GREEN's BMW. OJEDA-AVILA entered the Dick's Sporting Goods store and shortly after returned to the Mercedes Benz. GREEN was seen getting in the rear passenger seat behind OJEDA-AVILA.

18

TAPIA-LLAMAS remained in the passenger seat. Agents saw TAPIA-LLAMAS talking to GREEN and OJEDA-AVILA for approximately thirty (30) minutes inside the vehicle. At one point, OJEDA-AVILA exited the vehicle and retrieved a medium-sized gift bag out of the trunk and returned to the driver's seat. At the conclusion of the meeting, agents saw GREEN exit the Mercedes Benz with the gift bag, enter his black BMW, and leave the Dick's parking lot. At the same time, OJEDA-AVILA and TAPIA-LLAMAS returned to the Kenwood Mall. Based on my training and experience, I believe the meeting with OJEDA-AVILA, TAPIA-LLAMAS, and GREEN was to discuss future drug trafficking deals and exchange contraband inside the gift bag.

47.     On January 23, 2020 at approximately 3:30 p.m., agents initiated surveillance in the area of the Bass Pro Shops located at 300 Cincinnati Mills Drive, Cincinnati, Ohio, using information obtained from the GPS tracker installed on GREEN's BMW. GPS data from the tracking device showed that GREEN left **SUBJECT PREMISES A2** and drove directly to the Bass Pro Shops. Agents believe that **SUBJECT PREMISES A2** is a new stash house GREEN uses in a manner consistent with how he used the Gallahad Court location discussed above.

48.     GREEN stopped visiting 11559 Gallahad Court and the utilities were changed over to a new subscriber on January 20, 2020. On January 29, 2020, GREEN established Duke Energy electrical services in his name at **SUBJECT PREMISES A2**. Agents further learned from Duke Energy that GREEN has yet to establish gas utilities at this address and also learned that **SUBJECT PREMISES A2** was recently purchased by GREEN's limited liability cooperation, KGRN Investments, LLC.

49.     Based on my training and experience, I know that it is unusual for a person to pay only for electric—and no gas utilities—if a person is using the location as his residence. I know that drug dealers often purchase properties under their respective business name in lieu of their real name to deter law enforcement detection. I also know that GREEN frequents **SUBJECT**

**PREMISES A2** irregularly based on location information obtained from GREEN's phone and location information obtained from a GPS tracker installed on his BMW. Accordingly, I believe **SUBJECT PREMISES A2** is being used a stash location for drug trafficking activity.

50.     While surveilling the Bass Pros Shops in Cincinnati on January 23, 2020, agents saw GREEN inside his BMW talking to the occupants of a white Nissan Altima, bearing California license plates 8JDF714.[7] Agents subsequently identified the occupants of the white Nissan Altima as OJEDA-AVILA and Georgina TAPIA-LLAMAS.

51.     Shortly after initiating surveillance, agents saw both vehicles leave the area of the Bass Pro Shops together and followed the vehicle(s) to Kroger located at 1212 Kemper Road, Cincinnati, Ohio. Agents saw GREEN exit his BMW and stand at the driver's side window of the Altima where he was seen talking to OJEDA-AVILA and TAPIA-LLAMAS for approximately ten minutes.

52.     At approximately 3:47 p.m. on January 23, 2020, GREEN walked into Kroger while OJEDA-AVILA and TAPIA-LLAMAS left the area in the Nissan Altima and went back to the Bass Pro Shops. For the next several minutes, OJEDA-AVILA and TAPIA-LLAMAS removed items from the trunk and meticulously organized them back into the trunk. Based upon my training and experience, I believe OJEDA-AVILA and TAPIA-LLAMAS were rearranging items inside the trunk to the Altima in an effort to conceal contraband. Agents continued to surveil OJEDA-AVILA and TAPIA-LLAMAS where they were seen taking the Nissan Altima through a car wash and ultimately leaving the Cincinnati, Ohio area. GREEN thereafter took a circuitous route back to **SUBJECT PREMISES A3**.

---

[7] California license plates 8JDF714 are registered to EAN Holdings (Enterprise Rent-A-Car) at 14002 East 21st Street, Suite 1500, Tulsa, Oklahoma. According to Enterprise Rent-A-Car records, the white Nissan Altima was rented by Estafania Canady of 6211 South Avondale Blvd., Tolleson, Arizona.

53.     On March 9, 2020, agents established surveillance at **SUBJECT PREMISES A3**. At approximately 3:20 p.m., agents saw a black female subject driving a black Toyota Camry, bearing Ohio license plates HXC8116 pull in front of GREEN's apartment building and park at the curb.   Immediately  thereafter,  GREEN  exited  **SUBJECT PREMISES A3** walked  to  the passenger side of the Toyota Camry.  After a brief conversation, the Toyota Camry left the area and GREEN walked back inside **SUBJECT PREMISES A3**.  A query of license plates HXC8116 returned "Dorsel Hicks" as the registered owner.  Agents were then able to identify HICKS as the operator of the Toyota Camry based on her driver's license photo.  HICKS has also been identified as the registered owner of the silver Mercedes Benz that OJEDA-AVILA was seen operating during GREEN and OJEDA-AVILA's at the previous stash house on Gallahad Court in December 2019.

54.     On April 23, 2020, agents established surveillance at the Drury Inn and Suites located in Sharonville, Ohio where a Kia Optima rental and a Nissan Altima rental, used by TAPIA-LLAMAS  and  VALENZUELA-GARIBALDI,  were  seen  parked  and  unoccupied.  At approximately 9:05 a.m., agents saw six (6) outgoing text messages on a "WhatsApp" pen register from Target Telephone 3, used by TAPIA-LLAMAS, to GREEN's telephone.  At approximately 9:08 a.m., GREEN called TAPIA-LLAMAS, which I believe was made to discuss where and when the two would meet later that day.  Prior to the WhatsApp text message exchanges, location data obtained from GREEN's phone showed that he stayed overnight at 352 Cherry Drive, Dayton, Ohio 45405 (hereinafter **SUBJECT PREMISES A5**), departing the area at approximately 10:08 a.m. before arriving at **SUBJECT PREMISES A3** at approximately 11:08 a.m.

55.     On April 23, 2020 at approximately 2:00 p.m., TAPIA-LLAMAS and VALENZUELA-GARIBALDI were seen leaving the Quality Inn and arriving at the Drury Inn and Suites in Sharonville, Ohio where they were staying during their time in Cincinnati. At

approximately 2:15 p.m., TAPIA-LLAMAS and VALENZUELA-GARIBALDI entered into the Nissan Altima and left the area.

56.     On April 23, 2020, agents surveilled TAPIA-LLAMAS drive a Nissan Altima to **SUBJECT PREMISES A1**, also a suspected replacement stash location for the Gallahad Court location.  While there, TAPIA-LLAMAS met with GREEN after a series of text messages and a phone call over Target Telephone 3.  Agents saw the Nissan Altima parked in **SUBJECT PREMISES A1**'s garage.

57.     More specifically, at approximately 2:28 p.m. on April 23, 2020, TAPIA-LLAMAS and VALENZUELA-GARIBALDI were seen parking the Nissan Altima near **SUBJECT PREMISES A1**'s garage where GREEN's Land Rover was seen parked and unoccupied.  At approximately 4:31 p.m., GREEN was seen crossing the street from the area of 43 Wuest Street to **SUBJECT PREMISES A1**, walking towards the Nissan Altima.  At approximately 5:35 p.m., agents drove by **SUBJECT PREMISES A1** and saw the Nissan Altima had moved into the **SUBJECT PREMISES A1**'s garage.  Due to agent's inability to observe activity at **SUBJECT PREMISES A1** without being compromised, the time at which the Nissan Altima pulled into the garage is unknown.

58.     At approximately 5:54 p.m., agents saw the Nissan Altima in the driveway of **SUBJECT PREMISES A1**.  TAPIA-LLAMAS was seen talking with GREEN while she was sitting in the driver's seat of the Nissan Altima. Shortly after, TAPIA-LLAMAS and VALENZUELA-GARIBALDI left **SUBJECT PREMISES A1** and drove straight to the Quality Inn in Sharonville.

59.     Based on my training and experience as a TFO who routinely investigates drug trafficking crimes, I know that DTOs frequently use Nissan Altimas to transport drugs and/or bulk currency because of the naturally occurring voids inside the vehicle.  I have also talked with fellow

law enforcement officers, specifically, uniform officers with extensive training and experience in highway interdiction, who told me one such void is situated under the rear passenger seat of the vehicle where the fuel sending unit is located. This large void can be accessed by removing the rear passenger seat of the vehicle and using a screw driver to extract the fuel sending unit. Once removed, it creates a large void in the gas tank capable of storing several kilograms of drugs and/or bulk amounts of United States currency. According to criminal interdiction officers, the process of accessing this void, loading/unloading the illegal contents, and returning the vehicle to working order is less than one hour.

60. Based on my training and experience, my knowledge that this DTO frequently uses Nissan Altima's to conceal contraband, my knowledge that TAPIA-LLAMAS was seen driving the Kia Optima up until she met with GREEN at **SUBJECT PREMISES A1**'s garage in the Nissan Altima, and my knowledge that it is unusual to park in a garage that is not your own, and that the Nissan Altima was parked in **SUBJECT PREMISES A1**'s garage for only a short duration, I believe that TAPIA-LLAMAS and GREEN used **SUBJECT PREMISES A1** to load or unload contraband and used the garage to conceal their drug trafficking activity from plain view.

61. After GREEN left **SUBJECT PREMISES A1**, location data obtained from GREEN's phone showed that he arrived to **SUBJECT PREMISES A3** at approximately 6:53 p.m. GREEN remained at **SUBJECT PREMEISES A3** until the following day, April 24, 2020, at approximately 11:49 p.m. where location information obtained from GREEN's BMW showed he left **SUBJECT PREMISES A3** and drove directly to **SUBJECT PREMISES A5**.

62. Agents have learned that when GREEN is not staying at **SUBJECT PREMISES A3**, he stays at **SUBJECT PREMISES A5**. Agents have verified this through location data obtained from GREEN's phone and a GPS tracking device installed on GREEN's BMW sedan.

Additionally, agents have observed GREEN's Land Rover parked at this address during overnight hours while attempting to install a court authorized GPS tracking device on GREEN's Land Rover.

63.     An administrative subpoena served to Dayton Power and Light Utilities revealed that GREEN established utilities at **SUBJECT PREMISES A5** under his name on March 28, 2018 and closed the account on April 22, 2020 – the day before GREEN was observed meeting with TAPIA-LLAMAS at **SUBJECT PREMISES A1.** After April 22, 2020, utilities were transferred to Latesha SANTOS who agents believe GREEN is residing with. Based on my training and experience, I know that drug dealers will often establish utilities in a different person's name to deter detection by law enforcement.

64.     Through location data obtained from GREEN's phone and a covert GPS tracking device on GREEN's BMW, agents have noted a pattern of GREEN frequenting **SUBJECT PREMISES A1, SUBJECT PREMISES A2** and **SUBJECT PREMISES A3** and traveling directly to or from **SUBJECT PREMISES A5** since February of 2020.  Furthermore, agents have noted that GREEN has used telephone(s) to contact OJEDA-AVILA and TAPIA-LLAMAS while location data obtained from those telephones have shown him at **SUBJECT PREMISES A5**.  Based on my training and experience, my knowledge of GREEN frequenting other **SUBJECT PRESMISES(S)** directly before or after being at **SUBJECT PREMISES A5**, my knowledge of GREEN using telephones to contact OJEDA-AVILA and TAPIA-LLAMAS while at **SUBJECT PREMISES A5** and GREEN recently transferring utilities to a third party's name while still actively residing at **SUBJECT PREMISES A5**, I believe that GREEN is using **SUBJECT PREMISES A5** to store items in furtherance of drug trafficking, including but not limited to, cell phones.  I also know based on my training and experience that drug traffickers will attempt to hide their use of and presence at physical locations by placing utilities in the name of third parties.

### D. Probable Cause for SUBJECT PREMISES A4

65. On April 8, 2020, Matthew W. McFarland, United States District Court Judge for the Southern District of Ohio authorized the initial interception of wire communications over (859) 242-1515 (**Target Telephone 1**) subscribed to and used by Gabriel THOMAS, who TAPIA-LLAMAS distributed drugs to in July 2019, September 2019 and December 2019. Interception over **Target Telephone 1** terminated on May 7, 2020.

66. On April 10, 2020, agents intercepted a phone call between Gabriel THOMAS over (859) 242-1515 (Target Telephone 1) and phone number 513-515-1287, a number used by Raymond JOHNSON (the owner of **SUBJECT PREMISES A4**). During the conversation, THOMAS and JOHNSON discussed the drug trafficking activities of a third party, believed to be SOMMERVILLE, and a Hispanic woman believed to be TAPIA-LLAMAS:

| JOHNSON | I said because he (I believe "he" refers to SOMMERVILLE, further discussed below) just had met up with the lady (I believe "the lady" refers to TAPIA-LLAMAS) that I was saying |
|---|---|
| THOMAS | Oh yeah? |
| JOHNSON | Mm-hmm |
| THOMAS | Nope. I ain't talked to her |
| JOHNSON | She had showed up with, uh, just another lady. Said, well dude, uh….Pollo (I believe "Pollo" refers to OJEDA-AVILA) wasn't even with her. |
| THOMAS | For real? So that's her, huh? |
| JOHNSON | I don't know. And he said he can't take a picture of her because she had this like scarf thing on around, like around her face and shit so...he...he's trying to take a picture for me but he just said (unintelligible) you wouldn't even been able to recognize her I said brah I'm gonna be able to recognize this bitch like it's (unintelligible). I said bruh if you just take a picture of her fucking eyes I'm a be able to recognize her [laughs]. He said he gave her whatever little money he had or whatever. She told him probably another week or two, she could probably shoot it from there, shit |
| THOMAS | Oh She gonna bring it? Or Shoot it? (I believe "Shoot" means to mail) |
| JOHNSON | It sound like bring it. It sound like she pulling up. That's why I was like maybe it ain't the same one. Like, that's why I was like let me call him and see if she done hit him or something. You |

25

| | know what I mean? |
|---|---|
| THOMAS | Nope. She hit me a little while ago and gave me the number but she was talking about some bread (I believe "bread" is referring to money). I told her, "Shit I ain't had no bread" |
| JOHNSON | Man shit, that's what it sounded like with him. They done gave him some (I believe "some" is referring to narcotics) and he can't really do too much with it |
| THOMAS | They done gave him that shit, they done gave him that shit, man, they done got back from me bruh and I ain't (unintelligible) to it |
| JOHNSON | That shit wild. Yeah that's what I was trying to figure out man |
| THOMAS | Yeah,,,yeah cause she (I believe "she" is referring to TAPIA-LLAMAS) called me and gave me her new number. That was about it. But once I told them I didn't have no food (I believe "food" is slang for money), shit. I ain't... I can't put myself in that hole. I (unintelligible) fucked up and gave it to...ain't no telling (unintelligble) and get the fuck on forever |
| JOHNSON | You know that |
| THOMAS | Ah yeah. I can't risk it. Hey y'all damn near feel like I should of kept a little thirty (I believe "thirty" refers to $30,000, the approximate cost of a kilogram of cocaine) like man ya'll know where I'm gone man. But I...but I know she gonna try and come back and make some shit, she just...she just trying to wiggle up right now. |

67.     Through toll analysis agents determined the only common caller identified between THOMAS and SOMMERVILLE is JOHNSON. Additionally, information from administrative subpoena(s) served on Duke Energy showed that SOMMERVILLE is currently living at 2519 Hemlock Street in Cincinnati, Ohio (**SUBJECT PREMISES A4**), a residence owned by JOHNSON. Based on the conversation between THOMAS and JOHNSON, my knowledge that the only common contact between THOMAS and SOMMERVILLE is JOHNSON's 513-515-1287 telephone number, and my knowledge that SOMMERVILLE was contacted by two different telephone numbers used by OJEDA-AVILA, I believe that the third party discussed in the above conversation is SOMMERVILLE. Furthermore, I believe that SOMMERVILLE is purchasing and distributing drugs for the OJEDA-AVILA DTO.

68.     Through toll data and location data, agents determined that there was frequent contact between Target Telephone 2, used by OJEDA-AVILA and Target Telephone 3, used by

26

TAPIA-LLAMAS with both GREEN and SOMMERVILLE in late April 2020. Accordingly, agents initiated surveillance in the Cincinnati area at locations OJEDA-AVILA and TAPIA-LLAMAS were known to frequent when they were in town.

69.     On April 21, 2020, TFO Vanover saw a 2020 Silver Altima, bearing California Registration 8NDE204 in the parking lot of the Drury Inn and Suites in Sharonville, Ohio. The vehicle became of interest when the returned query identified it as being registered to EAN Holdings (Enterprise Rent-a-Car). Contact was made with an employee at Enterprise Rent-a-Car, who advised that Selma VALENZUELA-GARIBALDI had rented the vehicle in Phoenix, Arizona.

70.     After more than half an hour at approximately 7:08 p.m. on April 23, 2020, agents saw TAPIA-LLAMAS enter the driver's seat of the Kia Optima, while VALENZUELA-GARIBALDI entered the passenger seat and the two left the area. At approximately 7:14 p.m., Target Telephone 3 made an outgoing call to SOMMERVILLE. Agents followed the Kia Optima until they saw it park at Kroger located at 1 East Corry Street in Cincinnati, Ohio at approximately 7:42 p.m. At approximately 7:43 p.m., Target Telephone 3 received an incoming call from SOMMERVILLE. At this time, agents saw SOMMERVILLE operating a white Dodge Charger, bearing Ohio registration GZT4471 pull into the Kroger parking lot. At approximately 7:43 p.m., Target Telephone 3 made an outgoing phone call to SOMMERVILLE.

71.     Immediately after Target Telephone 3 made the outgoing call to SOMMERVILLE, agents saw SOMMERVILLE exit his Dodge Charger and walk to the Kia Optima. At the same time, VALENZUELA-GARIBALDI exited the Kia Optima and walked to an unknown location toward Kroger. SOMMERVILLE entered the passenger side of the Kia Optima and talked with TAPIA-LLAMAS for approximately six (6) minutes.

72.     At approximately 7:48 p.m., SOMMERVILLE exited the Kia Optima and entered his Dodge Charger and left the area driving directly to and entering **SUBJECT PREMISES A4**. At approximately 8:02 p.m., VALENZUELA-GARIBALDI was seen getting back into the Kia Optima.  TAPIA-LLAMAS and VALENZUELA-GARIBALDI then left the area.  Based on my training and experience, my knowledge that TAPIA-LLAMAS sources cocaine to local traffickers in Cincinnati, my knowledge that it is unusual to travel 20 minutes to meet with someone in a parking lot for only six (6) minutes, my knowledge of the conversation intercepted on Target Telephone 1 believed to be about SOMMERVILLE, I believe that the meeting between TAPIA-LLAMAS and SOMMERVILLE was to discuss their drug trafficking activities or that there was an exchange of contraband that agents were unable to observe.

73.     Additionally, agents know from interceptions over Target Telephone 2 previously discussed, that as of April 28, 2020 OJEDA-AVILA contacted SOMMERVILLE to let him know that his drug shipment was delayed. Therefore, I know that OJEDA-AVILA and TAPIA-LLAMAS are sourcing SOMMERVILLE with drugs.  Given that SOMMERVILLE has been seen going directly back to **SUBJECT PREMISES A4** after meeting with TAPIA-LLAMS, I believe SOMMERVILLE is using **SUBJECT PREMISES 4** to store contraband.

## **CONCLUSION**

74.     4301 Kessler Avenue, Cincinnati, Ohio 45217; 3976 Wess Park Drive, Cincinnati, Ohio 45217; 1134 Lois Drive, Apartment C, Cincinnati, Ohio 45237; 2519 Hemlock Avenue, Second Floor, Cincinnati, Ohio 45206; 352 Cherry Drive, Dayton, Ohio 45405 are supported by probable cause to believe that the items listed in Attachment B will be found at the locations and that these will constitute evidence of drug trafficking.  This is based upon information set forth herein, including surveillance conducted on all locations, information received from confidential and reliable informants, and from information gathered from the Title III interceptions over THOMAS', OJEDA-AVILA's and TAPIA-LLAMAS' cellular phones.   Agents know that GREEN and TAPIA-LLAMAS are using 4301 Kessler Avenue in furtherance of illegal drug trafficking.  Agents have probable cause to believe that GREEN is using 3976 Wess Park Drive, 1134 Lois Drive, Apartment C and 352 Cherry Drive in the furtherance of illegal drug trafficking. Agents have probable cause to believe that SOMMERVILLE is using 2519 Hemlock Avenue, Second Floor in the furtherance of drug trafficking.  It is my belief that items of evidentiary value pertaining to illegal drug trafficking are located inside the above listed locations. I request that this be filed under seal as the investigation into this drug trafficking organization and its activities is still ongoing.

Respectfully Submitted,

_____
Michael J. Matulewicz
Task Force Agent
Drug Enforcement Administration

Sworn before me, this  22nd   day of May, 2020.**via electronic means.**

_____
Hon. Stephanie K. Bowman
United States Magistrate Judge

29

# **SUBJECT PREMISES A1**



**4301 Kessler Avenue, Cincinnati, Ohio 45217**, further described as a one-story garage constructed of a brown brick and gray-colored garage door, with six large windows located on the front of the building. All six windows are encased by gray brick that matches the front door. The building also has a large glass window, roughly the size of a garage door. The drive way is a cement that leads from the road to the garage. The Hamilton County (Ohio) auditor's website lists the parcel identification number for this residence as 218-0057-0019-00.

To include any safes or other containers found in the building, locked or unlocked, as well as any storage areas assigned to the residence, garages or outbuildings, front and rear yard area, and any commonly shared storage or access areas. To include any vehicles within the curtilage of the property.

# SUBJECT PREMISES A2



**3976 Wess Park Drive, 1st Floor, Cincinnati, Ohio 45217**, further described as a two-story multi-family dwelling constructed of a red brick and white-colored siding outer shell with a red-brown shingled roof. The front door to the residence is white, located directly under the white siding/awning. There are seven large windows located on the front of the residence, one of which is encased by white siding just left of the front door. The Hamilton County (Ohio) auditor's website lists the parcel identification number for this residence as 115-001-0210-00.

To include any safes or other containers found in the building, locked or unlocked, as well as any storage areas assigned to the residence, garages or outbuildings, front and rear yard area, and any commonly shared storage or access areas. To include any vehicles within the curtilage of the property.

## <u>SUBJECT PREMISES A3</u>



**1134 Lois Drive, Apartment C, Cincinnati, Ohio 45237**, further described as a two-story multiple-family dwelling constructed of a brown brick with brown shingles on the roof. The front door to the building is covered by a metal awing. There are five large windows located on the front of the residence. The Hamilton County (Ohio) auditor's website lists the parcel identification number for this residence as 117-0004-0208-00. Apartment C is located on the second floor to the left as you walk up the common area stairwell. The door to Apartment C is dark brown with a gold colored bolt-lock and doorknob, labeled with dark colored "C" above the eyehole.

# SUBJECT PREMISES A4



**2519 Hemlock Avenue, Second Floor, Cincinnati, Ohio 45206,** further described as a two-story two-family dwelling, constructed of gray siding on the top level and gray/brown stone on the lower level. The front door to the residence is white in color, and is located under an awning, with stairs leading up to the front door from the sidewalk. There is one window located to the right of the front door, with another three located on the upper level. The Hamilton County (Ohio) auditor's website lists the parcel identification number for this residence as 070-0002-0033-00.

To include any safes or other containers found in the building, locked or unlocked, as well as any storage areas assigned to the residence, garages or outbuildings, front and rear yard area, and any commonly shared storage or access areas. To include any vehicles within the curtilage of the property.

## <u>SUBJECT PREMISES A5</u>



**352 Cherry Drive, Dayton, Ohio 45045**, further described as a two-story single-family dwelling constructed of a gray vinyl with a light brown shingled roof. The address of "352" is affixed to the front door, which is gray in color. There are two large windows located on the front, lower level of the residence, one window located on the top level of the residence. The residence has a front porch covered with the roof acting as an awning. The Montgomery County (Ohio) auditor's website lists the parcel identification number for this residence as R72 07104A0065.

To include any safes or other containers found in the building, locked or unlocked, as well as any storage areas assigned to the residence, garages or outbuildings, front and rear yard area, and any commonly shared storage or access areas. To include any vehicles within the curtilage of the property.